## CARL G. HELM, BERNICE McINTIRE and JEAN STITZEL *v.* DEPARTMENT OF REVENUE

Carl G. Helm, Helm, Wasley & Monce, La Grande, and Edwin J. Welsh, Welsh & Winfree, Portland, represented plaintiffs.

G. F. Bartz, Assistant Attorney General, Salem, represented defendant.

Decision for plaintiffs remanding to Department of Revenue rendered March 8, 1974, as amended April 15, 1974.

CARLISLE B. ROBERTS, Judge.

Plaintiffs appealed to the defendant to correct the farm use values established by the Assessor of Union

County on certain of their real property as of the assessment date, January 1, 1971, on the ground that such values were excessive under the provisions of the farm use statute, ORS 308.345 to 308.365.

After a hearing, the Department of Revenue affirmed the assessor's values in its Order No. VL 72-459 (dated September 21, 1972), for the reason that "the Petitioners have not overcome the propriety of the assessment." The plaintiffs have appealed from the department's order and in their complaint have set out the assessor's farm use value on each account number and the farm use value as alleged by them for each parcel, as follows:

| Assessor's Acct. No. | Assessor's Farm Use Values | Plaintiffs' Farm Use Values |
|---|---|---|
| 1. 4S40 900 5-6 | $ 5,280 | $ 5,150 |
| 2. 4S40 900 5-8 | 38,940 | 22,500 |
| 3. 4S39 4201 5-8 | 33,210 | 15,800 |
| 4. 4S40 1900 5-8 | 6,730 | 2,900 |
| 5. 4S40 2200 5-8 | 61,990 | 35,800 |
| 6. 4S407 100 5-8 | 17,870 | 8,100 |
| 7. 4S407 201 5-8 | 930 | 400 |
| 8. 4S407 300 5-8 | 13,190 | 5,700 |
| 9. 3S39 6000 15-3 | 9,740 | 5,328 |
| 10. 3S39 6200 15-3 | 10,200 | 5,260 |
| 11. 3S39 6200 15-9 | 45,810 | 21,000 |
| | $243,890 | $127,938 |

The "farm use" statute, ORS 308.345 et seq., enacted in 1967, entitles farmland to a special value assessment, to be determined as of January 1 each year. The market data approach to value, using comparable sales figures, requires that "the county assessors and the Department of Revenue shall make sufficient investigation to ascertain that the sales so utilized in fact

represent sales for bona fide farm use," free of values attributable to urban influence or speculative purchases; if such comparable sales are not available, subsection (3) of ORS 308.345 must be followed. It provides:

"(3) When comparable sales figures cannot be utilized in arriving at assessed values of agricultural lands as provided in subsection (2) of this section by reason of insufficient sales meeting the criteria set forth in subsection (2) of this section, the assessed values of agricultural lands shall be arrived at by utilizing an income approach. In utilizing the income approach, the capitalization rate shall be the typical capitalization rate used for appraising nonagricultural commercial land in the area in which the agricultural land is located. The Department of Revenue annually shall determine and specify such rate, and shall certify such rate to the county assessors."

The State Tax Commission (now the Department of Revenue) promulgated a number of regulations respecting the special valuation of agricultural land pursuant to the "farm use" statute. See R308.370 et seq. (promulgated in the office of the Secretary of State in February 1968 and printed in the State Tax Commission's "Laws and Regulations Relating to Assessment and Taxation 1967"). Additionally, it issued to the county assessors 13 typed pages of "Instructions for Assessors in Implementation of Laws Relating to Lands Eligible for Farm Use Land Assessment," State Tax Commission Form VD-C-68 (12-67) (hereinafter referred to as Departmental Instructions).

The Departmental Instructions begin with a description of the comparable sales approach to farmland use value; all parties agree that this method was inapplicable in Union County from the time of the

enactment of the law in 1967 through the year in issue, 1971-1972, because of a lack of usable sales. The Departmental Instructions then explain the income approach to farmland use value in detail, stating, at 3:

> "A problem in valuing farm land by the income method is how to segregate the income applicable to the farm land from that applicable to management. The accepted approach to this problem is the use of typical yields, typical commodity prices, typical rental agreements and typical expenses from the area under appraisal. * * *"

The court has had the benefit of a transcript of the voluminous testimony and the exhibits and there can be no question that the preponderance of the evidence proves that the county assessor failed to carry out the defendant's instructions in preparing the county farm use roll for the first year of its application (1968) and that such roll was never adequately corrected thereafter, to and including the year here in issue.

The evidence shows that the assessor's office was lamentably shorthanded in 1968 and that the defendant's Union County Field Office Manager, a person of considerable experience and training in farm matters, on whom great reliance was placed by the county assessor, was unable properly to carry out his assignment by virtue of the heavy duties imposed upon him in other counties as well as in Union County, a lack of assistance, and the indifferent handling of the farm use exemption forms, both by the taxpayers generally and the assessor's counter clerks.

This sorry situation, admitted to by all the parties, may serve as an explanation of the deficiencies in the assessment roll for farm use purposes but, of course, it is no defense to the allegations of the plaintiffs.

■■■ In making its determinations, the county relied heavily, almost exclusively, upon a few atypical cash rentals; the testimony shows clearly that the crop-share rental was used in 90 percent of the cases involving the cultivation of small grains, which constitutes the larger part of the crop in the Grande Ronde Valley. The Departmental Instructions state, at 8-9:

"The crop-share rental is the usual rental agreement in the wheat counties. For many years the typical crop-share allocation was one-third to the landlord and two-thirds to the tenant. In this arrangement, the landlord's only expense was real property taxes. However, this allocation of crop and expenses has been changing in recent years as leases are renewed and one will now find many variations. Some, but not necessarily all of these variations are as follows:

"1. Landlord receives one-third of the crop, pays one-third of the fertilizer and 2-4-D material, and all of the real property taxes.

"2. Landlord receives one-third of the crop; and the tenant pays for all of the fertilizer, 2-4-D and property taxes.

"3. Landlord receives 40 percent of the crop and pays only the property taxes.

"Consult advisory committee for other variations.

"Because of variations, it is important that the rental data be obtained from the individual county as it is essential that rents be based on *typical* landlord-tenant arrangement for the area involved.

"The government wheat program still affects prices received for wheat and the number of acres that can be planted to wheat. Program controls vary from year to year and from county to county, again requiring these data to be obtained from the individual county Agricultural Stabilization Conservation Service (ASCS) office."

These instructions were substantially disregarded by the defendant's field office manager. Yet the evidence indicates that the variation in crop-share rentals was not so great but that, with diligence, an acceptable result could be obtained.

█ Other errors can be cited. For example, prior to the farm use statute, the assessor's office had divided the whole Grande Ronde Valley (hereinafter referred to as the Valley) and adjacent districts into five geographical areas, chiefly based upon soil classifications and elevation, with the Elgin area in the north, separated from the Valley proper by the Base Line and, adjacent to the Valley proper to the south, Starkey, North Powder, and Pondosa-Medical Springs. The testimony indicates that the use of these areas for farm use values was highly unsatisfactory.

Using public records to determine assigned water rights, a $5-an-acre addition to the values in the five areas was made when the records indicated such irrigation rights. Overwhelming expert testimony indicated that this did not give rise to equality in valuation because of the lack of relationship between irrigation rights and the actual availability of rainfall and irrigation water. Evidence was undisputed as to the tremendous difference in productivity arising from the extremely varied rainfall in the Valley proper (differing, annually, from 8 inches in certain places to 26 inches in other places, although such areas are only a few miles apart).

The Departmental Instructions advised the assessor that a questionnaire would assist in obtaining rental data and should be used to obtain the information needed to establish the farm use values in the county. The evidence shows that a questionnaire was made

available to taxpayers seeking the farm use valuation but that apparently no effort was made whatsoever to see that the information was complete and usable.

The testimony makes it clear that the sample of the leases used by the county's appraisers was so small that, even with optimum information as to each item, these leases could not have supplied a reliable base from a statistical standpoint.

The Departmental Instructions advise, at 5:

"The assessor should keep carefully assembled all data which he has used in developing farm use values on a land class basis. This should be done in respect to each assessment roll."

It appears that virtually all the records assembled in the assessor's office in 1969, on which the 1971 assessment roll (with minimal updating) was based, were brought into court. (A few records had been lost.) The impression made as to methodology was poor. The conclusions are necessarily substantially subjective and the elucidation of them by the defendant's witnesses does not carry conviction.

Both the assessor and the defendant's field office manager were in agreement that use value, under the lease arrangement, was basically measured by productivity and that, in the arable lands of Union County, the chief factors in productivity were soil class, elevation, and the availability of water. However, the assessor's staff treated the whole Valley floor, south of the Base Line (with the exception of a small area), all the way south to the border of the sparse grazing lands, as one area. The testimony of the defendant's field office manager revealed his knowledge of many variations in this single area which were not recog-

nized in the small sampling relied upon by him for the purposes of farm use valuation. Another witness, Mr. Burr Courtright, was presented by the plaintiffs and established as an expert on the basis of education and experience, who is presently engaged in the design, sale, installation and servicing of irrigation equipment primarily, but who deals in all kinds of water equipment. His testimony is illuminating in respect to the difference in soils on the floor of the Valley proper from the standpoint of production. In answer to a question as to the categories in which the Valley proper should be placed from the standpoint of farm productivity of soils, as affected by available water, he stated (Tr 219-221):

"A Starting at the south end of the valley on the east side, there is the Union area which would encompass the town of Union and would go west to Mt. Craig, and that area south of the Union highway we would put in one area. There's quite a little area north of that highway at various points that are quite similar. However, we put the area from Hot Lake north to the Ladd Creek, and then following Ladd Creek to Catherine Creek, and then following the meander of Catherine Creek to Five Points in another area. We classify the lands within a mile of the Cove road a different area.

"In the Cove area, there's the Cove slope and then there's about a mile from the toe of the slope out that's a different area. That extends down to Rinehart as being quite similar. Not in rainfall, but in soils.

"We split that area in two right in the middle right about where the old Grande Ronde River channel comes into the area. So that ends up being two areas.

"Going east from Five Points and on the north side of Catherine Creek, there's an area about—well, it tapers to a point where the Catherine Creek

and the old Grande Ronde River channel comes together, and it extends east and gets progressively worse, I would say, to half way between the airport road, or what is known as Pearce Lane, and McAlister Lane, and it's about two miles wide at that end.

"There is a strip of land from Island City east to one mile of the toe of the slope, which we consider to be somewhat the same, even though there are different soil classifications in the area.

"Then north of the Cove road, there's a strip that follows the meander line of the Sand Ridge, the south edge of the Sand Ridge between the Cove road and south end of Sand Ridge that we classify as a different area, even though it is somewhat similar to the south of that road.

"Then we consider the Sand Ridge proper, which is from one mile the other side of Imbler south to Conley warehouse, and it has fingers that go south from that, the meander line. But this is all basically, very evenly textured soil with pretty much the same classification, same situation, quite uniform.

"South of the Cove road area, you have many, many different soil series within each of the areas described."

"Q   Now, from the standpoint of the ability to produce crops, can you classify the valley soils more generally than you have just now in answer to my previous question?"

"A    Yes. Very broadly, I would say that north of the Cove-Island City highway tends to be much more productive for various reasons than does that south of the Cove-Island City highway."

Such a proliferation of subdivisions of the assessor's one geographical area, as recommended by Mr. Courtright, may well be in line with the requirements of a good farm use appraisal. Another witness, Mr. M. A. Greer, rural property supervisor of the Umatilla

County Assessor's office, testified that he had analyzed 400 crop leases in that county and had found it advisable to segregate the county into 29 income-value zones, utilizing 99 conversion rates!

The court agrees with the plaintiffs that all farm use values in Union County for the tax year 1971-1972 are suspect and that defendant would be well-advised to make a careful, detailed examination in depth as to the present situation. For the purposes of this case, it is the order of the court that the present matter shall be remanded to the Department of Revenue for further determination and the issuance of a new order, unless the parties can stipulate that the value asserted by plaintiffs as to the subject properties for the year in question is correct.

If the parties are unable to stipulate the value of subject property as of January 1, 1971, the defendant is directed by the court to make a new appraisal of subject property and submit to this court its findings and determination of value, taking into consideration the following requirements and provisions:

1. The defendant shall request and the plaintiffs shall supply the defendant with the necessary data (as reflected in the Departmental Instructions) for the calendar year 1970, showing (a) the use of the land by acres, the kind and units of production by acre, the acres lying fallow or unused, or unusable, and the total acres; (b) the landlords' share of the production in crop units and the units delivered to them in kind or money.

2. In order to obtain data on reasonably typical farm operations, similar information for the calendar year 1970 shall be obtained by the defendant from a

reasonable number of other landlords (in this instance, four or five) leasing land which will be similar to subject property in that (a) the land must be south of the Cove-Island City Highway and of the general characteristics of subject property; (b) the soils must be similar in classification to those of subject property; (c) the utilization of water must be on a par with the utilization of water by the subject property; and (d) the crops harvested must be of the same kinds as harvested in 1970 on the subject property. Defendant shall give careful consideration to the data contained in Plaintiffs' Opening Brief, pp 42-48, inclusive.

3. In determining the landlords' typical net income, a uniform three percent deduction from gross shall be allowed for management.

4. The capitalization rate used upon the landlords' net income to obtain land value shall be 7.5 percent plus a tax rate percentage equal to that imposed in the code area in which the subject property is located in the tax year 1970-1971.

Further instructions may be obtained from the court upon petition of counsel. Jurisdiction of the suit is retained by the court until a final value is determined, in accordance with the requirements of this decision and requested modifications thereof, approved by the court. After the defendant's recommended value of the subject properties is submitted to the court and protests, if any, have been heard, the court's final decision will issue.